UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| MICHAEL HAMPTON | * | CIVIL ACTION NO.  10-1926<br>Section P |
| VERSUS | * | JUDGE DONALD E. WALTER |
| SHERIFF ANDY BROWN, ET AL. | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the court are cross-motions for summary judgment filed by plaintiff Michael Hampton [doc. # 72], and defendants, Sheriff Andy Brown, Assistant Warden Ducote, Warden Billy Tigner, and Major Jon Thomas [doc. # 75].  The motions have been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For reasons stated below, it is recommended, *inter alia*, that plaintiff's motion for summary judgment [doc. # 72] be DENIED, and that defendants' motion for summary judgment [doc. # 75] be GRANTED.

## Procedural History

On December 30, 2010, Michael Hampton, an inmate in the custody of Louisiana's Department of Public Safety and Corrections, filed this pro se civil rights complaint under  42 U.S.C. § 1983 against Jackson Parish Sheriff Andy Brown; Warden Billy Tigner; Assistant Warden Ducote; Major John Thomas; unnamed medical staff at the  Jackson Parish Correctional Center ("JPCC"); and an unnamed medical department nurse.  Hampton alleges that during the roughly seven months (from July 14, 2010, until February 17, 2011) that he was confined at the

JPCC, he was exposed to intolerable levels of environmental/second hand tobacco smoke ("ETS"); housed in unsanitary conditions; denied requested medical attention; denied the opportunity to participate in rehabilitation programs; and suffered retaliation by JPCC authorities after he complained about the foregoing circumstances.  Plaintiff seeks injunctive relief in the form of a transfer to a Department of Corrections facility, plus punitive damages in the amount of $5,000 for each day that JPCC authorities caused him to endure the unhealthy conditions at the facility.  (Amend. Compl. [doc. # 4]).

On February 17, 2011, the undersigned determined that plaintiff sufficiently pleaded a cause of action, and ordered service on the named defendants.  (Feb. 17, 2011, Mem. Order [doc. # 12]).  Defendants answered plaintiff's complaint, as amended, on May 23, 2011.  [doc. # 43].  At the close of the discovery period, plaintiff filed the instant motion for summary judgment on October 27, 2011.  Defendants filed their cross-motion for summary judgment on November 18, 2011.  Following delays for briefing, the matter is now before the court.

<u>**Summary Judgment Principles**</u>

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving

party may meet its burden to demonstrate the absence of a genuine issue of material fact by

pointing out that the record contains no support for the non-moving party's claim." *Stahl v.*

*Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-

movant is unable to identify anything in the record to support its claim, summary judgment is

appropriate. *Id*.

  In evaluating the evidence tendered by the parties, the court must accept the evidence of

the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at

255.  "The court *need* consider only the cited materials, but it *may* consider other materials in the

record." Fed.R.Civ.P. 56(c)(3) (emphasis added).  While courts will "resolve factual

controversies in favor of the nonmoving party," an actual controversy exists only "when both

parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc).  There can be no genuine issue as to a material fact when a

party fails "to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477

U.S. at 322-23.  This is true "since a complete failure of proof concerning an essential element of

the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

  When a movant bears the burden of proof on an issue, it must establish "beyond

peradventure[1] all of the essential elements of the claim . . . to warrant judgment in [its] favor."

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  In other words, the movant must

affirmatively establish its right to prevail as a matter of law.  *Universal Sav. Ass'n v. McConnell*,

1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

## Analysis

Defendants contend that they are entitled to summary judgment not only on the merits of

the complaint, but also because plaintiff failed to exhaust available administrative remedies

before filing suit.  The Fifth Circuit recently addressed the procedure that courts should employ

in this context:

> [w]hen the defendant raises exhaustion as an affirmative defense, the judge should
> usually resolve disputes concerning exhaustion prior to allowing the case to
> proceed to the merits. If the plaintiff survives summary judgment on exhaustion,
> the judge may resolve disputed facts concerning exhaustion, holding an
> evidentiary hearing if necessary. Then, if the judge determines that the plaintiff
> has exhausted administrative remedies or that his or her failure to exhaust should
> be excused, the case may proceed to the merits.

*Dillon v. Rogers*, 596 F.3d 260, 270-273 (5th Cir. 2010).  (footnote omitted).[2]

Accordingly, the court will first consider defendants' exhaustion defense.

## I.      Exhaustion of Administrative Remedies

a)      Law

Pursuant to 42 U.S.C. § 1997e, as amended by the Prison Litigation Reform Act

("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of

---

[1]  I.e., beyond doubt.

[2]  The Fifth Circuit reaffirmed that the exhaustion affirmative defense may be addressed
in the context of a motion for summary judgment where the non-moving party enjoys the
protections of Federal Rule of Civil Procedure 56.  *Id.*

4

this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory, and is required even where the relief sought cannot be granted by the administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006) (citations omitted). All "available" remedies must be exhausted, whether speedy and effective, or not. *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002). "Proper exhaustion requires that the prisoner not only pursue all available avenues of relief but also comply with all administrative deadlines and procedural rules." *Johnson v. Kukua*, 342 Fed. Appx. 933, 934 (5th Cir. Aug. 20, 2009) (unpubl.) (citing *Woodford v. Ngo*, 548 U.S. at 89-93, 126 S.Ct. 2378)). An untimely or otherwise procedurally defective administrative grievance does not satisfy the exhaustion requirement. *Id*.

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, supra* (citation omitted) (emphasis added). An inmate is required to "exhaust his remedies, irrespective of the form of relief sought, injunctive or monetary." *Richbourg v. Horton*, 2008 WL 5068680 (5th Cir. Dec. 2, 2008) (unpubl.) (citation omitted). Exhaustion also applies to claims brought against defendants in their official and/or individual capacities. *See e.g., Williams v. Henagan*, 595 F.3d 610, 618 (5th Cir. 2010); *Hines v. Texas*, 76 Fed. Appx. 564 (5th Cir. Sept. 29, 2003) (unpubl.).

The Fifth Circuit has consistently held that an inmate's ignorance of a prison's grievance procedures does not excuse his noncompliance. *Aguirre v. Dyer*, 233 Fed. Appx. 365 (5th Cir. May 24, 2007) (unpubl.) (citation omitted); *Simkins v. Bridges*, 350 Fed. Appx. 952, 953-954,

5

(5th Cir. Oct. 28, 2009) (unpubl.) (citation omitted); *Plaisance v. Cain*, 374 Fed. Appx. 560, 561, ( April 15, 2010) (unpubl.) (citation omitted).  Nonetheless, inmates should have "avenues for discovering the procedural rules governing their grievances." *Dillon, supra*.  When an inmate has no means of verifying the administrative grievance process, then misleading information by prison officials may make remedies unavailable. *Id*.

Exhaustion is an affirmative defense; thus, the burden is on defendant to establish that plaintiff failed to exhaust available administrative remedies. *Dillon*, 596 F.3d at 266.  If the court considers evidence beyond the pleadings to resolve the exhaustion issue, then the nonmoving party is entitled to the protections of Rule 56. *Id*.

b)      Defendants Did Not Establish That Plaintiff Failed to Exhaust Available
        Administrative Remedies

In support of their motion for summary judgment, three of the four named defendants averred that they were aware of a "functioning and meaningful system for dealing with complaints lodged by inmates . . ."  Affidavit ("Aff.") of Timmy Ducote; Def. Exh. 2; Aff. of Billy Tigner; Def. Exh. 3; Aff. of Jon Thomas; Def. Exh. 4.  Defendants, however, conspicuously failed to disclose in their affidavits precisely what this "system" was or whether it even was in effect at the JPCC.  Defendants instead emphasize that Hampton acknowledged the JPCC grievance process when he explained that an inmate could send a letter to the warden at the first step, whereupon the warden would disseminate the grievance to the appropriate subordinate. (Defs. MSJ, Memo., pg. 4 (citing Hampton Depo., Def. Exh. 1, pg. 9)).

Upon closer scrutiny, however, it is manifest that defendants relied upon deposition testimony in which plaintiff was describing the grievance process in effect at the Richwood

Correctional Center, *not* the JPCC.  (Hampton Depo., pgs. 8-9, Def. Exh. 1).  Later in their brief, defendants proffered up a four-step grievance procedure that Hampton purportedly identified. (Defs. MSJ, Memo., pgs. 21-22).  This time, however, defendants did not even attempt to support this alternative grievance process with any citation to the evidentiary record.  *Id.*

Despite defendants' unsuccessful attempts to demonstrate a grievance process at the JPCC, the court notes that in plaintiff's original complaint he acknowledged that there was a grievance procedure in effect at the JPCC.  *See* Compl.  Hampton further explained that he filed a grievance form with the warden of the facility on November 17, 2010, but never received a response.  *Id.*  Plaintiff confirmed at his deposition that the first grievance form that he filed was on November 17, 2010.  (Hampton Depo., pgs. 33-34).  The form is entitled "Request for ARP Form," and is attached to plaintiff's complaint and to his deposition as Exhibit "B."  (Hampton Depo., pg. 35; Hampton Depo., Exh. B).[3]  In the form, Hampton asked to be shipped to the Department of Corrections because he was not receiving proper rehabilitation at the current facility.  *Id.*  He also complained that he did not smoke, and the current facility did not provide non-smoking dormitories.  *Id.*  He indicated on the form that the grievance was not an emergency, and added that he had made several requests to be transferred, but had not received a response.  *Id.*

Plaintiff also explained that he sent requests to Warden Tigner and Major Jon Thomas, which went unanswered.  (Hampton Depo., pg. 36).  Hampton attached to his complaint a copy of an October 27, 2010, unofficial grievance that he wrote to Major Jon Thomas in which he

---

[3]  Plaintiff stated that this was the first "ARP" (Administrative Remedy Procedure) that he wrote.  *Id.*, at pg. 35.

complained that the cigarette smoking in the dormitories and the lack of outside recreational opportunities were making him sick.  (Hampton Depo., pgs. 37-38; Hampton Depo., Exh. C). Accordingly, he requested a transfer to a Department of Corrections facility.  *Id*.

Hampton further testified that he wrote two letters to Sheriff Andy Brown.  (Hampton Depo., pgs. 57-58).  However, he did not make copies of these letters.  *Id*., at pg. 39.  He wrote his first letter to the sheriff sometime after October 27, and the second letter on December 22.  *Id*. Hampton sent the first letter to the sheriff at 500 East Court, but never received a response.  *Id*., at pgs. 57-58.

On December 30, 2010, Hampton was called out of the "chow hall" to meet with Major Thomas and Captain Nash about his complaints.  *Id*., at pgs. 59-60.  Thomas told Hampton that the sheriff's secretary had faxed him a copy of Hampton's complaint, and had directed him to respond to it.  *Id*., at pg. 64.  Tellingly, Sheriff Brown does not deny in his affidavit that he received Hampton's complaint.  *See* Aff. of Andy Brown; Defs. MSJ, Exh. 5.  Instead, he averred that whenever he would receive a letter or written document from an inmate complaining about the conditions at the JPCC, his practice was to forward the letter or written document to the JPCC to be addressed by the appropriate prison officials.  *Id*.  Sheriff Brown's procedure appears consistent with Hampton's description of his own experience.

In sum, plaintiff has adduced evidence that at least for purposes of his claims for ETS exposure and the denial of opportunities to participate in rehabilitation programs, he made some attempt to resolve the issues with prison officials before filing suit.  In the absence of evidence (uncontroverted or otherwise) to establish precisely what the JPCC grievance process entailed, defendants have not established that plaintiff failed to exhaust available administrative remedies

before filing suit.[4]

## II.    Plaintiff's Claims on the Merits

a)      Environmental Tobacco Smoke ("ETS") Exposure

In *Helling v. McKinney*, the Supreme Court held that prison officials may violate the

Eighth Amendment's prohibition against cruel and unusual punishment by exposing inmates to

*excessive* levels of ETS.  *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482

(1993) (emphasis added).  The Court also formalized a "two-prong test" to determine whether an

inmate's exposure to ETS resulted in a transgression of constitutional proportions.  *See*

*Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001) (citing *Helling, supra*).

The first prong of the test is objective; it requires the prisoner to demonstrate that he,

himself, was, or is being exposed to unreasonably high levels of environmental tobacco smoke.

*Helling, supra*.  Further,

> with respect to the objective factor, determining whether [a prisoner]'s conditions
> of confinement violate the Eighth Amendment requires more than a scientific and
> statistical inquiry into the seriousness of the potential harm and the likelihood that
> such injury to health will actually be caused by exposure to ETS. It also requires a
> court to assess whether society considers the risk that the prisoner complains of to
> be so grave that it violates contemporary standards of decency to expose *anyone*
> unwillingly to such a risk. In other words, the prisoner must show that the risk of
> which he complains is not one that today's society chooses to tolerate.

*Id*. (emphasis in original).

---

[4]  While it certainly could be argued that plaintiff did not exhaust administrative remedies
for purposes of his claims for inadequate medical care and retaliation, defendants still did not
establish what procedures were in effect that plaintiff should have exhausted.  Moreover, given
that the retaliation claim stems from the filing of the instant complaint it would be neither
expedient, nor in the interest of justice to require exhaustion at this point.  *See Johnson v. Ford*,
261 Fed. Appx. 752, 754 (5th Cir. Jan. 14, 2008) (citation omitted) (recognizing that exhaustion
may be excused where dismissal would be inefficient and not further the interests of justice or
the purposes of the exhaustion requirement).

For the second, or subjective, prong, the plaintiff must show that the defendant prison officials were deliberately indifferent to his plight.  *Id*.  To prevail, ultimately, a prisoner must satisfy both prongs of the test.

The objective component of plaintiff's burden is lightened somewhat by prior court decisions that take judicial notice of the United States Surgeon General's June 2006 report, which concluded that there are no safe levels of exposure to second hand smoke.[5]  *See Murrell v. Casterline*, 2008 WL 822237, *1 (5th Cir. March 25, 2008) (unpubl.) (noting that the magistrate judge in the lower court took judicial notice of such report in concluding that plaintiff had met first prong of *Helling* on summary judgment); *Gauthier v. Anderson*, 2010 WL 2718980 (W.D. La. Apr. 21, 2010).  However, while the Surgeon General's report provides some support for the harmful effects of ongoing exposure to ETS, it does not address the residual effects upon the health of a passive smoker once his exposure to ETS ceases.

For instance, according to a 2010 Surgeon General's report, the risk of myocardial infarction appears to rapidly decline once exposure to ETS ceases.  *See A Report of the Surgeon General: How Tobacco Smoke Causes Disease*, pg. 363.[6]  Moreover, evidence is insufficient to infer a causal relationship between increased risk of coronary heart disease and exposure to ETS.

_____

[5] *See* The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General-Executive Summary, available at http://www.surgeongeneral.gov/library/secondhandsmoke/report/executivesummary.pdf.
Pursuant to Rule 201, a court may take judicial notice of an adjudicative fact that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources who accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).  Moreover, judicial notice may be taken at any stage of the proceeding. Fed. R. Evid. 201(f).

[6]  Available at http://www.surgeongeneral.gov/library/tobaccosmoke/report/index.html. (Last visited on 2/22/2012).

10

*Id*.

Indeed, in this case, less than two months after Hampton was transferred out of the JPCC, he signed a health history profile at Richwood Correctional Center wherein he indicated (by omission) that he did not have, nor had he ever had shortness of breath or asthma.  (Med. Records [doc. # 62-4, pg. 26]).  Additionally, prison medical records from April 14, 2011, indicate that plaintiff saw a physician with complaints of shortness of breath, and "real bad burning in chest area."  *Id*., at pg. 8.  However, no shortness of breath or coughing was noted.  *Id*. Upon examination, Hampton exhibited no wheezing, rales, or ronchi.  *Id*.  No pathology was appreciated.  *Id*.  The physician concluded that he/she would see Hampton, as needed.  *Id*.

In sum, plaintiff has not adduced any evidence of any long-term health consequences that he experiences (or may experience) that are causally related to his several months of ETS exposure at the JPCC.  Furthermore, as plaintiff "has long since been transferred away from the [JPCC] and there is no indication that he will return to that facility, his claims for declaratory and injunctive relief are moot."  *Busick v. Neal*, 380 Fed. Appx. 392, 398-399, 2010 WL 2102322, *6 (5th Cir. May 26, 2010) (unpubl.) (citation omitted).

Nonetheless, plaintiff's entire ETS claim is not mooted by his transfer, because he also seeks punitive damages against defendants for each day that defendants exposed him to ETS. Thus, the court must proceed to consider society's perceptions of ETS exposure.  *Helling, supra*. In this regard, while many public and private institutions, including local correctional facilities, have banned indoor smoking,[7] as of 2001-2002, approximately 30 percent of indoor workers in the United States were not protected by smoke-free workplace policies.  *See The Health*

---

[7] La. R.S.40:1300.256(B)(14).

*Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General, U.S. Department of Health and Human Services.*[8]  Indeed, Louisiana currently permits smoking in bars and in designated areas on river boats where gaming operations occur.  La. R.S.40:1300.256(B)(14).  Louisiana also permits smoking in "[d]esignated and well ventilated smoking rooms in nursing homes which permit smoking . . . ,"[9] – despite the Surgeon General's admonition that ventilating buildings does not eliminate ETS exposure.  *See The Health Consequences of Involuntary Exposure to Tobacco Smoke, supra*.  The court also is not aware of any Louisiana state law that protects children – those who suffer most from the effects of ETS – from their involuntary exposure to ETS by their own parents in the home or in private vehicles.[10]

In other words, given the many circumstances where society still permits vulnerable individuals to be exposed to ETS, *e.g.*, employees in certain workplaces, children in the home, and nursing home residents, plaintiff has not demonstrated that society considers ETS exposure "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *See Helling, supra*.  While society may be on its way to such a smoke-free utopia, that day has not yet arrived.[11]

---

[8]  Available at http://www.surgeongeneral.gov/library/secondhandsmoke/factsheets/factsheet5.html (Last visited on 2/22/2012).

[9]  La. R.S.40:1300.256(B)(11).

[10]  As the surgeon general recognized, "millions of Americans continue to be exposed to secondhand smoke in their homes and workplaces."  (The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General-Executive Summary).

[11]  In so finding, the court does not intend to suggest that an inmate will never be able to satisfy *Helling*'s objective prong.  Rather, the path the court follows today is dictated by the particular circumstances of this case.

12

The court further emphasizes that Hampton admitted that he did not complain about ETS exposure at the JPCC until October 2010, despite his exposure to ETS from the time that he arrived at the facility in mid-July 2010.  *See* Hampton Depo., pgs. 41-44.  The fact that Hampton endured the ETS for almost three months before lodging a complaint raises a question regarding the severity of the exposure, or at the very least, plaintiff's initial appreciation of the severity of the problem.  This issue is underscored by evidence that plaintiff likely contributed to his own ETS exposure by his practice of buying cigarettes to barter for services at the JPCC.  (Hampton Depo., pgs. 54-55).  Particularly revealing, however, is plaintiff's frank, unsolicited admission that his

> reasons for this entire lawsuit . . . Was because, number one, I want to get sent to a DOC facility so I get rehabilitation.  I don't have any job– any trade ability, and I want to get trade skills.  And I want to get out of a smoking environment.  I wrote as many letters and grievances as I possibly could, but they would not send me to a DOC facility, so this – So, I mean, this actually sparked this entire lawsuit.  All they had to do was send me to DOC.  That's not– I mean, I have a legal right to be rehabilitated.

*Id*., at pgs. 26-27.

Plaintiff later reiterated that

> this whole lawsuit is originated.  It–it's started but – simply because of the fact all I was trying to do is to get a transfer to the –to the Department of Corrections, you know . . . all I was trying to get, you know, was proper rehabilitation.  All I wanted to get is to–to get to a DOC facility.  This whole thing could have been avoided.

*Id*., pgs. 77-78.

Thus, according to plaintiff, his claims herein merely served as a means to achieve his goal of securing a transfer to a facility that provided rehabilitation programs.[12]

---

[12]  This impression is buttressed by plaintiff's February 20, 2011, submission to this court wherein he stated that he had been transferred to LaSalle Correctional Center, which he described as a non-smoking facility that was a lot cleaner and offered 24 hour medical care.  (Feb. 20,

Furthermore, plaintiff's testimony regarding the extent of his exposure to ETS at the JPCC proved minimal.  He stated that inmates in "N" Dormitory smoked after the lights were turned out.  (Hampton Depo., pgs. 61-62).  He acknowledged, however, that the guards provided very little supervision in that dormitory because it was a recovery dormitory that relied upon inmate mentors to oversee the residents.  *Id*.  Plaintiff also testified that he observed several instances where inmates smoked in front of a particular guard in "L" Dormitory.  *Id*., at pgs. 49-53.[13]  However, he did not know the name of the guard.  *Id*.  Moreover, "sporadic and fleeting ETS exposure, even though it results in discomfort such as coughing and nausea, does not constitute unreasonably high levels of ETS."  *Callicutt v. Anderson*, 48 Fed. Appx. 916 (5th Cir. Sept. 11, 2002) (unpubl.) (citation and internal quotation marks omitted).

In sum, plaintiff has failed to adduce sufficient competent summary judgment evidence to support *Helling*'s objective prong.  Plaintiff's showing as to the subjective prong is similarly deficient.

As stated earlier, the subjective element requires plaintiff to show that the defendant prison officials were deliberately indifferent to his plight, which, in turn, mandates "a finding of

---

2011, Letter [doc. # 15]).  Plaintiff added, however, that LaSalle was not a Department of Corrections facility and did not offer the treatment options that are available at a Department of Corrections facility.  *Id*.  Nevertheless, plaintiff's impression of the LaSalle facility appears to have soured, because, just one month later, he began writing grievances to officials at the LaSalle facility complaining that the facility permitted smoking in the dormitories and living areas.  *See* Hampton, Depo., Exhs. Not surprisingly, Hampton's stay at LaSalle proved short-lived; on March 21, 2011, he was transferred to Richwood Correctional Center.  (Release Report [doc. # 62-2, pg. 5]).  On October 21, 2011, Hampton secured his latest transfer, again because of exposure to ETS.  (Pl. MSJ, pg. 4, n1).  This time, he was transferred from the West Carroll Detention Center to the Franklin Parish Detention Center.  *Id*.

[13]  Hampton apparently transferred to the "L" dormitory in late December 2010.  *See* Response to Req. for Prod. of Docs. [doc. # 57].

'obduracy and wantonness, not inadvertence or error in good faith.'" *Callicutt, supra* (quoting

*Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  Stated differently,

> a prison official cannot be found liable under the Eighth Amendment ... unless the
> official knows of and disregards an excessive risk to inmate health or safety; the
> official must both be aware of facts from which the inference could be drawn that
> a substantial risk of serious harm exists, and he must also draw the inference.

*Callicutt, supra* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

In determining whether prison officials have exhibited deliberate indifference to second-hand

smoke, the following factors are relevant:  the adoption of a smoking policy; the administration

of that policy; and "the realities of prison administration."  *Callicutt, supra* (quoting *Helling*, 509

U.S. at 36-37).

Defendants adduced evidence that the JPCC is a non-smoking facility, and that inmates

are only permitted to smoke outside during recreational periods.  (Affidavits of Ducote, Tigner,

Thomas, and Brown; Def. Exhs. 2-5).  All dormitories have posted notices that the JPCC is a

non-smoking facility, which were present during Hampton's tenure at the JPCC.  *Id*.  Defendants

adduced a copy of a notice signed by former warden Yelverton wherein he announced that

effective August 15, 2009, smoking would not be allowed anywhere inside of the facility,

whether by inmates or staff.  (Ducote Aff., Exh. A).  Inmates were permitted to smoke on the

yard only.  *Id*.

Inmates who were caught smoking in the dormitories were disciplined.  (Affidavits of

Ducote, Tigner, Thomas, and Brown; Def. Exhs. 2-5).  Defendants produced copies of

disciplinary reports issued to four inmates in August and October 2010 for smoking in the JPCC

dormitories.  (Ducote Aff., Exh. B).

During his deposition, plaintiff acknowledged that in August 2010, the "dorm rep." had a

meeting with the warden, and then came back and told the inmates that they could not smoke in the day room any longer.  (Hampton Depo., pgs. 45-46).  Instead, they had to go to the back door to smoke.  *Id*.  The warden told the dorm reps. that if they caught anyone "in the window smoking," then the offender would be disciplined.  *Id*.  Plaintiff also admitted that if the shift supervisor for "L" dorm, Lieutenant Gates, caught anyone smoking, he would pepper spray the offender.  *Id*., pgs. 51-52.

Plaintiff conceded that everybody knew that Warden Tigner did not allow smoking.  *Id*., pg. 69.  If Tigner found ashtrays on a table or around an inmate's bed, he would dump the ashes in the inmate's hand.  *Id*.  Nonetheless, plaintiff maintained that "for the most part on the overall they– they know – they really didn't all together, you know if they – they didn't enforce it, you know, as– as far as– I– I may be –." *Id*., pgs. 69-70.

In response to defendants' motion for summary judgment (and in support of his own), plaintiff did not adduce any evidence that any of the named defendants personally violated the JPCC's indoor smoking ban by either smoking themselves or by permitting inmates to smoke in their presence.  During his deposition, plaintiff initially stated that although he wrote letters to Warden Tigner about the smoke, he never spoke to him about this issue.  (Hampton Depo., pg. 69).  Plaintiff later testified, however, that on the one occasion that he did talk to Tigner, he told him that he wanted a transfer to a different facility because of the smoking in the dormitory, and the lack of a non-smoking dormitory.  *Id*., pgs. 71-72.  Plaintiff also admitted that he spoke to Sheriff Brown once, but not about smoking.  *Id*., pg. 64.

Although the court is obliged to accept the evidence of the non-movant as credible and draw all justifiable inferences against summary judgment, the undersigned is not persuaded that

16

plaintiff has produced "*significant evidence* demonstrating the existence of a genuine fact issue," for purposes of his ETS claim. *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (citation omitted). Even crediting plaintiff's testimony that he advised Warden Tigner and Sheriff Brown that inmates were smoking in the dormitories, plaintiff has not adduced sufficient evidence to support a finding that the defendants were deliberately indifferent to his plight. According to plaintiff, Tigner did not personally tolerate smoking. Moreover, the summary judgment record contains evidence of four disciplinary actions against smoking violators. Critically, plaintiff does not challenge the facility's practice of selling cigarettes to inmates. In fact, he himself benefitted from the sale of cigarettes by using them to barter for services.

With regard to Sheriff Brown, the court recounts that just eight days after plaintiff mailed his second letter to Brown, Major Thomas told Hampton that the sheriff's secretary had "faxed" him a copy of the complaint and directed him to respond to it. (Hampton Depo., pg. 64-66). Around this same time period, plaintiff received a transfer from "N" dorm to "L" dorm. *See* Response to Req. for Prod. of Docs. [doc. # 57]. Moreover, less than two months after plaintiff had the meeting with Major Thomas to discuss his complaints, he received the relief that he had requested from Warden Tigner: a transfer to a different facility, that at least according to plaintiff's initial impression, appeared to provide a non-smoking environment. *See* discussion, *infra*.[14]

Defendants' ultimate response to plaintiff's complaints (effecting a transfer to another

---

[14] Albeit the transfer did not placate plaintiff because it was not a transfer to a Department of Corrections facility.

institution), does not reflect their deliberate indifference to his ETS exposure, when, as here, there is no evidence that the defendants were aware that the transferee institution did not provide a smoke-free environment that met plaintiff's standards.  Likewise, the fact that the transfer did not occur for two to three months is not inherently unreasonable under the circumstances, where defendants first transferred plaintiff to two other dormitories, and where plaintiff himself did not seemingly assign any particular urgency to the ETS exposure, considering that he was content to endure the conditions for over two months before he sought redress.

In sum, on the existing record, the undersigned is compelled to find that no reasonable trier of fact could find that the named defendants violated plaintiff's Eighth Amendment right against cruel and unusual punishment as a result of his exposure to ETS at the JPCC.  *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 411 (5th Cir. 2008) (no reasonable trier of fact could find for the nonmoving party).  "When deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result."  *Johnson, supra* (citations and internal quotation marks omitted).  In this non-jury pro se prisoner complaint, the undersigned magistrate judge typically is the trier of fact at a *Flowers* hearing.

b)    Unclean Living Conditions

Plaintiff next contends that, while housed at the JPCC, he was subjected to unclean or unsanitary conditions in the dormitory.  It is axiomatic that

> [f]or conditions of confinement to rise to the level of an Eighth Amendment
> violation, they must be "cruel and unusual" under contemporary standards.  To the
> extent that such conditions are restrictive and even harsh, they are part of the

18

> penalty that criminal offenders pay for their offenses against society. However, when the restrictions of confinement rise to a level that results in physical torture, it can result in pain without penological purpose constituting cruel and unusual punishment under the Eighth Amendment.  It is the obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (citations and internal quotation marks omitted).

During his deposition, plaintiff admitted that it was each inmate's responsibility to control the area around his bed.  (Hampton Depo., pg. 66).  He also stated that every Wednesday, two orderlies and a dorm rep. would hose down and scrub the dormitory.  *Id*., pg. 67.  At the 8:00 p.m. inspection, the major would come through the dormitory to ensure that it was clean.  *Id*. Plaintiff argued, however, that after the cleaning, inmates would spit on the floor and in the garbage can.  *Id*., pgs. 67-68.  Hampton added that he would catch colds because of these conditions.  *Id*.

Plaintiff's evidence, however, fails to establish that the living conditions at the JPCC rose to the level of a constitutional violation.  By plaintiff's own admission, the facility maintained a policy of scouring the dormitories on at least a weekly basis.  Moreover, the only physical injury that he purportedly suffered because of these conditions was that he contracted cold viruses. Assuming that this injury is more than *de minimis*, plaintiff has not adduced any competent summary judgment evidence sufficient to establish a causal link between the colds that he contracted and any inmate saliva that was left on the dormitory floors or in the garbage cans. Furthermore, plaintiff has not submitted competent summary judgment evidence to establish that the named defendants were deliberately indifferent to these conditions.  At a minimum,

defendants initially transferred plaintiff to another dormitory, and then ultimately secured a

transfer to a completely different facility that plaintiff conceded was a lot cleaner.  *See* Feb. 20,

2011, Letter [doc. # 15].

       c)    <u>Inadequate Medical Care</u>

Plaintiff contends that around September 8, 2010, he tried to make an emergency sick call

because he was coughing up "blood and the mucous and so forth."  (Hampton Depo., pg. 72).

Hampton explained that Deputy Johnson advised him that, per Nurse Courtney Whitehead, if an

inmate "ma[d]e emergency," and he was not dying or bleeding, then he would be written up for

aggravated malingering.  *Id*., pg. 73.  When Hampton heard this, he told Deputy Johnson not to

worry about his emergency, because he did not want to be written up.  *Id*.

To establish liability for inadequate medical care under the Eighth Amendment, an inmate

must adduce facts which "clearly evince" a serious medical need and the prison official's

deliberate indifference to it.  *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation

omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).  Deliberate

indifference in the context of an episodic failure to provide reasonable medical care to a prisoner

means that:  (1) the official was aware of facts from which an inference of substantial risk of

serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's

response indicates that the official subjectively intended that harm occur.  *Thompson v. Upshur*

*County, Tx.,* 245 F.3d 447, 458-59 (5th Cir. 2001).  "[T]he failure to alleviate a significant risk

that [the official] should have perceived, but did not is insufficient to show deliberate

indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.

2001).  Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a

grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459.

"Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant

to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see*

*also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). "[A] delay in medical care violates

the Eighth Amendment only if it is due to deliberate indifference and results in substantial harm."

*Gregory v. McKennon*, 2011 WL 2473714 (5th Cir. June 22, 2011) (unpubl.) (citation and internal

quotation marks omitted).

Applying the foregoing principles to the instant facts, the court notes that if, as Hampton

alleges, he *was* coughing up blood, then, per Nurse Whitehead's policy, as related to plaintiff, he

would *not* have been written up because he purportedly *was* bleeding. Further, plaintiff

complained about the policy for "emergency" sick calls, but there is no indication that Nurse

Whitehead employed the same policy for routine, non-emergency sick calls. Moreover, when a

physician eventually examined plaintiff at a different facility in April 2011, the physician

discerned no acute symptoms. *See* Med. Records [doc. # 62-4, pg. 26].

In sum, plaintiff has not adduced any evidence that a defendant herein actually inferred a

substantial risk of harm stemming from plaintiff's alleged inadequate medical treatment, or that a

defendant subjectively intended him to suffer harm. Furthermore, plaintiff has not demonstrated

that he suffered any physical harm caused by the alleged lack of adequate medical care at the

JPCC.

d)      Rehabilitation Programs

Plaintiff complains that defendants deprived him of the opportunity to earn good time

credits because the JPCC did not offer educational, vocational, or other rehabilitation programs,

as purportedly mandated by Louisiana law.  *See* La. R. S. 15:828.  Plaintiff contends that this policy deprives him of liberty and property interests protected under the Due Process Clause and his right to equal protection under of the 14[15]th Amendment.

       To state a constitutional claim for either a substantive or procedural due process violation, plaintiff must demonstrate that he was "denied a cognizable liberty or property interest clearly established either by state law or the United States Constitution."  *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir.2000); accord *Sandin v. Conner*, 515 U.S. 472, 481-83, 115 S.Ct. 2293 (1995) (a prisoner has a liberty interest only in "freedom[s] from restraint ... impos [ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *Bryan v. City of Madison*, 213 F.3d 267, 274 (5th Cir.2000) (property interest).[16] However, neither the Due Process Clause, nor any other provision of the Constitution affords prisoners the constitutional right to educational or rehabilitative services or programs.  *Beck v. Lynaugh*, 842 F.2d 759, 762 (5th Cir.1988); *see also Smith v. Boyd*, 945 F.2d 1041, 1043 (8th Cir.1991) (prisoners do not have a constitutional right to "social services."); *Newman v. State of Alabama*, 559 F.2d 283, 292 (5th Cir.1977), rev'd in part on other grounds *sub nom., Alabama v.*

---

[15]  This court recently had occasion to address this same issue in several suits brought by inmates in the custody of the Louisiana Department of Public Safety and Corrections ("LDOC"), who were housed at the Caldwell Detention Center in Grayson, Louisiana.  *See Clark v. Owner, Louisiana Correctional Service, Inc.*, 2011 WL 2270864 (W.D. La. May 4, 2011). Consequently, the undersigned draws heavily upon the reasoning therein.

[16]       While no State may deprive any person of life, liberty, or property without due process of law, it is well-settled that only a limited range of interests fall within this provision.  Liberty interests protected by the Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws of the States. *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864 (1983) (quotation and citation omitted).

*Pugh*, 438 U.S. 781, 98 S.Ct. 3057 (1978) (prisoners do not possess a protected liberty interest in

educational programs, recreation opportunities, or in avoidance of being transferred to facilities

where the programs are less comprehensive); *Bulger v. United States Bureau of Prisons*, 65 F.3d

48, 49 (5th Cir.1995) (no federal constitutional right to participate in an education or

rehabilitative program while incarcerated).

Furthermore, inmates do not have a protected liberty interest in their classification status

or in the opportunity to earn good-time credits.  *See Luken v. Scott*, 71 F.3d 192, 193 (5th

Cir.1995) (loss of opportunity to earn good-time credits is merely a collateral consequence of the

prisoner's custodial status which does not create a constitutionally protected liberty interest).

While prisoners who are entitled to release on mandatory supervision have a protected liberty

interest in previously earned good-time credits they are not constitutionally entitled to earn such

credits. *Compare Malchi v. Thaler*, 211 F.3d 953, 959 (5th Cir.2000) (the relation of good

time-earning status to a prisoner's release date is too speculative to create a liberty interest).

Contrary to plaintiff's argument, Louisiana Revised Statute 15:828 does not create a

protectible constitutional interest,[17] because it does not confer a legitimate claim of entitlement to

---

[17]  The statute provides, in relevant part, that,
[t]he secretary shall adopt rules and regulations for local jail facilities and state
correctional institutions to encourage voluntary participation by inmates in
certified treatment and rehabilitation programs, including but not limited to basic
education, job skills training, values development and faith-based initiatives,
therapeutic programs, and treatment programs. When funds are provided, such
educational programs shall be available at each penal or correctional institution
under the jurisdiction of the department. The rules and regulations may include
provisions for furloughs or the awarding of earned credits toward the reduction of
the projected good time parole supervision date. Offenders may be awarded up to
ninety days toward the reduction of the projected good time parole supervision
date for satisfactory participation in each approved program pursuant to the
provisions of this Subsection, but no offender shall receive more than two

good time credit.  *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103 - 2104 (1979) (citation omitted).  The statute directs the LDOC Secretary (not the named defendants), to adopt rules and regulations for local jails to encourage voluntary participation in such programs by the inmates in their custody.  Moreover, the requirement that such programs be made available remains contingent upon whether or not ". . . funds are provided . . ." a speculative condition that also remains beyond the control of the named defendants.  Furthermore, pursuant to state law,

> "any individual subject to confinement in a state adult penal or correctional institution shall be committed to the Louisiana Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department. <u>The director of corrections shall assign each newly committed inmate to an appropriate penal or correctional facility. The director may transfer an inmate from one such facility to another, insofar as the transfer is consistent with the commitment and in accordance with treatment, training and security needs established by the department</u> . . . "

La. R.S.15:824(A).

Plaintiff is an LDOC inmate and therefore his placement is solely within the purview of the LDOC.  Broad discretionary authority is afforded to prison administrators because the administration of a prison is "at best an extraordinarily difficult undertaking."  *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979 (1974).  To hold  that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.

------

hundred fifty days total earned credits toward the reduction of the projected good time parole supervision date for program participation.
La. R.S.15:828(B).

*Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976).  Prisoners simply do not have

a constitutionally derived liberty interest in being held in any particular institution.  *See Meachum*

*v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532 (1976).

Plaintiff also argues that the lack of rehabilitation/educational classes at the JPCC

violates the equal protection clause.  Presumably plaintiff contends that he is treated less

favorably than similarly situated LDOC inmates who enjoy these opportunities at other regular

LDOC facilities.  However, disparate impact alone does not suffice to state an equal protection

violation.  *Johnson v. Rodriguez*, 110 F.3d 299, 306-307 (5th Cir. 1997) (citation omitted).

Moreover, if "the challenged government action does not appear to classify or distinguish

between two or more relevant persons or groups, then the action----even if irrational----does not

deny them equal protection of the laws." *Id*. (citation omitted).  Here, there is no evidence that

the named defendants exercise authority over the opportunities available to inmates housed at

other LDOC facilities; thus, there is no evidence that *they* created two or more classifications of

similarly situated individuals who were treated differently.  *Oladipupo v. Austin*, 104 F. Supp. 2d

643, 651 (W.D. La. 2000) (citing *Rivera v. Senkowski*, 62 F.3d 80 (2nd Cir.1995)).

Finally, defendants' alleged failure to provide plaintiff with the types of services that he

desires does not constitute cruel and unusual punishment in violation of the Eighth Amendment.

The lack of rehabilitative programs does not by itself constitute cruel and unusual punishment,

nor does the Eighth Amendment require the provision of every amenity needed to avoid mental,

physical, or emotional deterioration. *See Alberti v. Klevenhagen*, 790 F.2d 1220, 1228 (5th Cir.

1986), citing, *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.1977), *cert. denied*, 438 U.S. 915,

98 S.Ct. 3144, 57 (1978).

Accordingly, defendants are entitled to judgment as a matter of law dismissing plaintiff's claim stemming from their alleged failure to provide rehabilitation programs.

E)      Retaliation

Plaintiff contends that, after he filed the instant complaint, defendants retaliated against him by 1) turning off the air conditioner to the dormitory on one occasion while he and other inmates were cleaning it, thus exposing them to the fumes from the cleaning solvents; 2) removing him from the alcoholics anonymous call-out program; and 3) transferring him to a different dormitory unit that was known for gang rivals and constant fighting.  *See* Amend. Compl. [doc. # 4].

"To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."  *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).  Prisoners are constitutionally protected from retaliation for complaining about a prison official's actions.  *See Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir.1995); *Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir.1989).  Accordingly, plaintiff has satisfied the first element of his retaliation claim.

For purposes of the remaining elements, the court notes that causation requires evidence that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods, supra* (citations omitted).  Plaintiff's mere belief that he was the victim of retaliation will not suffice.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 -311 (5th Cir. 1997) (citation omitted). Rather, "[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred."  *Woods*, 60 F.3d

26

at 1166 (citation omitted).  Either way, plaintiff's burden is significant.  *Id*.  Finally, the retaliatory act must be more than *de minimis*, that is, the challenged conduct is actionable "only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights."  *Morris v. Powell*,  449 F.3d 682, 686 (5th Cir. 2006).

Applying the foregoing principles to the facts at hand, the court finds that plaintiff has not adduced evidence sufficient to establish causation or that defendants intended to retaliate against him.  For instance, with regard to plaintiff's allegation that he was exposed to fumes from cleaning solvents, he further alleges that other inmates were present and that a non-defendant, Sergeant Bennett, was the guard who actually turned off the air conditioner.  However, the fact that other inmates were present belies plaintiff's belief that the action was taken in retaliation against him.  Moreover, there is no evidence that Sergeant Bennett was aware that Hampton had filed suit against other prison officials, or that he otherwise had been directed by anyone else to turn off the air conditioner.

Plaintiff similarly conceded at his deposition that he was not targeted or singled out for removal from the alcoholics anonymous program.  (Hampton Depo., pgs. 78-80).  Rather, the warden initiated a policy change that limited participation in the drug/alcoholic rehabilitation program solely to those inmates whose charges were drug or alcohol related.  *Id*.  In other words, the policy change applied to all inmates.

The alleged retaliatory act that is most plausible, centers upon plaintiff's transfer to a more dangerous dormitory at the JPCC.   Nonetheless, in response to defendants' motion for summary judgment, plaintiff has not adduced any direct evidence that defendants were motivated by ill-will; thus, he must rely upon a chronology of events to infer intent.  According to plaintiff,

27

however, Major Thomas transferred him to the more dangerous dormitory over one month after

plaintiff had advised Thomas that he had initiated the instant court proceedings.[18]

  While it certainly would behoove prison officials to wait some period before engaging in

retaliatory conduct in an effort to mask their true motivations, such a course is not reasonably

inferred in this case because plaintiff was transferred out of the prison on February 17, 2011, –

shortly after his challenged dormitory reassignment.  If defendants truly intended to retaliate

against plaintiff by placing him in this more dangerous dormitory, it is unlikely that they then

would have permitted his transfer to an entirely new facility, one, that at least according to

plaintiff's initial impression, appeared to offer better conditions than those he experienced at the

JPCC.

  In sum, in response to defendants' motion for summary judgment, plaintiff has not

adduced any competent summary judgment evidence sufficient to support each of the requisite

elements of his retaliation claim.  *See Richardson v. McDonnell*, 841 F.2d 120, 122 -123 (5th Cir.

1988) (despite sufficient period for discovery, plaintiff failed to offer any documentary or

testimonial evidence to support his retaliation claim).

### III. Qualified Immunity

  Defendants also invoke the affirmative defense of qualified immunity.  "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir.

---

   [18]  The transfer occurred on February 11, 2011.  *See* M/TRO/Emergency Transfer [doc. #
11].

2009) (quoted sources omitted).  When a defendant invokes qualified immunity, the burden shifts

to plaintiff to establish that the defense is inapplicable.  *Id.*  (citation omitted).  Plaintiff's burden

is two-pronged.  *Id.*  First, he must demonstrate that defendants violated a constitutional right

under current law.  *Id.*  "Second, he must claim that the defendants' actions were objectively

unreasonable in light of the law that was clearly established at the time of the actions complained

of."  *Id.*  (quoted source and internal quotation marks omitted).  The courts are "permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances of the particular case at hand."

*Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (*citing Pearson v. Callahan*, 808 U.S.

2009, 129 S.Ct. 808  (2009)).

      Having determined that the individual defendants did not violate plaintiff's constitutional

rights, *see* discussion, *supra*, analysis of the qualified immunity defense is unnecessary.

## IV.    Additional Unnamed Defendants

      Also included as defendants in the instant complaint are the medical staff at the JPCC and

an unnamed medical department nurse, who presumably is Nurse Whitehead.  However, this case

now is over one year old and plaintiff has failed to take any action to substitute a named

defendant for these unspecified defendants.  Because of the apparent lack of good cause for the

delay, plaintiff's claims against these defendants are subject to dismissal for failure to prosecute.

Fed.R.Civ.P. 41(b).  Alternatively, even if plaintiff had substituted named parties for these

generic defendants, plaintiff's claims against them are subject to dismissal for the same reasons

advanced by the moving defendants.  *See* discussion, *supra*.[19]

## V.    Government Entity and Supervisory Liability

To the extent that plaintiff intended to sue any defendant in his official capacity, the court observes that official-capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) (citing, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)).  To impose § 1983 liability against a government entity for the misconduct of one of its employees or officers, plaintiff must demonstrate that the constitutional deprivation was caused by a policy or custom of the entity.  *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)).  "In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff." *McConney v. City of Houston*,  863 F.2d 1180, 1184 (5th Cir. 1989).

In the case *sub judice*, plaintiff has not established an underlying constitutional violation by any defendant in his individual capacity.  *A fortiori*, he has not identified a precipitating unconstitutional custom or policy enacted by the government entity.  *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (because the officers did not violate plaintiff's constitutional rights, neither did the city).

_____

[19]  The court may grant summary judgment *sua sponte* so long as the adverse party receives adequate notice and a reasonable time to respond.  Fed.R.Civ.P. 56(f); *Stingley v. Den Mar Inc.*, 2009 WL 2762374, *3 (5th Cir. Sept. 1, 2009) (unpubl.) (citing *inter alia*, *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770-71 (5th Cir.2000)).  The instant report and recommendation provides adequate notice to the parties.  *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (citing *Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir.1998)).

Insofar as plaintiff seeks to hold the warden or sheriff liable in either one's supervisory capacity, the court emphasizes that supervisors can be held liable when the "enforcement of a policy or practice results in a deprivation of federally protected rights." *Bustos, supra* (citation omitted). Again, however, because plaintiff has failed to allege or establish a constitutional violation by the individuals directly involved in the challenged activity, he cannot show that any supervisor implemented a policy or custom that violated his constitutional rights. *Bustos*, 599 F.3d at 468.

## VI.    State Law Claims

To the extent that plaintiff's complaint, as amended, sets forth additional claims arising under state law, when, as recommended here, all constitutional claims which conferred federal subject matter jurisdiction are dismissed, the court may decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367.[20] In fact, this is the general rule. *Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004) (citation omitted). The twin interests of comity and efficiency dictate that any remaining state law claims be dismissed without prejudice. 28 U.S.C. § 1367(c).[21]

### Conclusion

For the reasons discussed above, the court finds that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Accordingly,

---

[20]    In the case *sub judice*, there is no indication that the court may exercise diversity jurisdiction, 28 U.S.C. § 1332.

[21]    The limitations period is tolled for a minimum of 30 days after dismissal. *See* 28 U.S.C. § 1367(d).

31

**IT IS RECOMMENDED** that the motion for summary judgment [doc. # 72] filed by plaintiff Michael Hampton be **DENIED**.

**IT IS FURTHER RECOMMENDED** that the motion for summary judgment [doc. # 75] filed by defendants, Sheriff Andy Brown, Assistant Warden Ducote, Warden Billy Tigner, and Major Jon Thomas, be **GRANTED**, and that judgment be entered in favor of said defendants, plus the medical staff at the JPCC and an unnamed medical department nurse, dismissing with prejudice plaintiff's claims arising under the Constitution and laws of the United States.  Fed. R. Civ. P. 56.

**IT IS FURTHER RECOMMENDED** that any remaining state law claims be **DISMISSED**, without prejudice.  28 U.S.C. § 1367(c).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 5th day of March

2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE